Case No. 18-55113

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

LA Park La Brea A LLC, *et al.*,

*Plaintiffs-Appellants*,

v.

Airbnb Inc., *et al.*,

*Defendants-Appellees.*

Appeal from a Decision of the United States District Court for the
Central District of California, No. 2:17-cv-04885-DMG-AS,
The Honorable Dolly M. Gee

## OPENING BRIEF OF APPELLANTS LA PARK LA BREA A LLC,
## LA PARK LA BREA B LLC, LA PARK LA BREA C LLC,
## AND AIMCO VENEZIA, LLC

MICHAEL T. WILLIAMS
ALLISON R. MCLAUGHLIN
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-5647
(303) 244-1800

JEREMY B. ROSEN
ERIC S. BOORSTIN
RYAN C. CHAPMAN
HORVITZ & LEVY LLP
3601 West Olive Avenue, 8th Floor
Burbank, California 91505-4681
(818) 995-0800

DAVID C. FREDERICK
BRENDAN J. CRIMMINS
RACHEL PROCTOR MAY
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

June 22, 2018

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1(a), Plaintiffs-Appellants submit the following corporate disclosure statement:

Plaintiffs-Appellants LA Park La Brea A LLC, LA Park La Brea B LLC, LA Park La Brea C LLC, and Aimco Venezia, LLC are majority-owned, indirect subsidiaries of Apartment Investment and Management Company ("Aimco"). Aimco has no parent corporation. The following publicly held corporation owns 10% or more of Aimco's stock: Cohen & Steers, Inc.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ................................................................1

JURISDICTIONAL STATEMENT ................................................4

STATEMENT OF THE ISSUES................................................4

STATUTE................................................................5

STATEMENT OF THE CASE................................................5

    A.    Statutory Context................................................5

    B.    Factual Background................................................9

        1.    Airbnb's brokerage services ................................9

        2.    Neighbors and communities struggle to deal with Airbnb .......18

        3.    Airbnb knowingly brokers short-term rentals that violate Aimco's leases ........................20

    C.    Procedural History................................................22

SUMMARY OF ARGUMENT ................................................26

STANDARD OF REVIEW ................................................28

ARGUMENT ................................................28

I.    SECTION 230 DOES NOT PREEMPT AIMCO'S COMPLAINT BECAUSE THE CLAIMS DO NOT "TREAT" AIRBNB "AS THE PUBLISHER" OF USER CONTENT................................................28

    A.    Section 230 Preempts Only Claims That Derive Liability From Publishing ................................................28

B.    Aimco's Claims Do Not Derive Liability From Publishing ..............33

C.    The District Court Committed Legal Errors In Dismissing Aimco's Complaint ...........................................................................40

    1.    The district court's reasoning contravenes this Court's standard for § 230 preemption ..................................................41

    2.    The district court erroneously relied on a superseded complaint...................................................................................42

    3.    The district court erroneously relied on off-point, out-of-circuit decisions.........................................................................44

II.    SECTION 230 DOES NOT PREEMPT CLAIMS BASED ON AIRBNB'S OWN CONTENT ......................................................................48

A.    Section 230 Does Not Preempt Aimco's Claims Based On Airbnb's Content .................................................................................48

B.    Airbnb's Content Enables Unauthorized Rentals ...............................51

C.    The District Court Erred In Holding That § 230 Preempts Claims Based On Content Airbnb Creates...........................................53

III.    THE DISTRICT COURT ABUSED ITS DISCRETION IN DISMISSING AIMCO'S COMPLAINT WITH PREJUDICE ...................57

CONCLUSION .....................................................................................................58

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

iii

# TABLE OF AUTHORITIES

Page(s)

CASES

*Aberdeen Apartments v. Cary Campbell Realty All., Inc.*,
   820 N.E.2d 158 (Ind. Ct. App. 2005) ............................................. 36

*Abraham v. Pac. Union Real Estate Grp., Ltd.*,
   No. A098900, 2004 WL 1047392 (Cal. Ct. App. May 6, 2004)...................... 35

*Airbnb, Inc. v. City & Cty. of San Francisco*,
   217 F. Supp. 3d 1066 (N.D. Cal. 2016).................................................... *passim*

*Amex-Protein Dev. Corp., In re*, 504 F.2d 1056 (9th Cir. 1974)............................. 49

*Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257 (N.D. Cal. 2006) ........................... 32

*Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753 (9th Cir. 2015) ....................... 37

*Barahona v. Union Pac. R.R. Co.*, 881 F.3d 1122 (9th Cir. 2018)......................... 57

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) .................................. *passim*

*Bates v. Dow AgroSciences LLC*, 544 U.S. 431 (2005) ............................ 32, 33, 38

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ...................................... 47

*Beckett v. Mellon Inv'r Servs. LLC*, 329 F. App'x 721 (9th Cir. 2009) ................. 58

*Beckman v. Match.com, LLC*, 668 F. App'x 759 (9th Cir. 2016) ................... 31, 57

*Blizzard Entm't Inc. v. Ceiling Fan Software LLC*,
   28 F. Supp. 3d 1006 (C.D. Cal. 2013)...................................................... 34, 37

*Bond v. United States*, 134 S. Ct. 2077 (2014) ...................................... 39

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ............ 3, 27, 53

*City of Chicago v. StubHub!, Inc.*, 624 F.3d 363 (7th Cir. 2010).................... 31, 42

*Cubby, Inc. v. CompuServe Inc.*, 776 F. Supp. 135 (S.D.N.Y. 1991) ..................... 6

*Daniel v. Armslist, LLC*, No. 2017AP344, 2018 WL 1889123
    (Wis. Ct. App. Apr. 19, 2018) .................................................................. 32, 56

*Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016) ........................... *passim*

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) ............................................. 45

*Donaher, III v. Vannini*, No. CV-16-0213, 2017 WL 4518378
    (Me. Super. Ct. Aug. 18, 2017) ................................................................. 45, 46

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003).... 28, 57, 58

*Evans v. Hewlett-Packard Co.*, No. C 13-02477 WHA, 2013 WL 5594717
    (N.D. Cal. Oct. 10, 2013) .............................................................................. 54

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) .................................................................. *passim*

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009) ..................................... 56

*FTC v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016) .......................... 31-32

*Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816 (2002) ................................................ 45

*Gibson v. Craigslist, Inc.*, No. 08 Civ. 7735(RMB), 2009 WL 1704355
    (S.D.N.Y. June 15, 2009) ............................................................................. 45

*Green v. Am. Online (AOL)*, 318 F.3d 465 (3d Cir. 2003) ................................... 45

*Hiam v. HomeAway.com, Inc.*, 267 F. Supp. 3d 338 (D. Mass. 2017),
    *aff'd on other grounds*, 887 F.3d 542 (1st Cir. 2018) ..................................... 49

*Hill vs. StubHub!*, 727 S.E.2d 550 (N.C. Ct. App. 2012) ..................................... 44

*HomeAway.com, Inc. v. City of Santa Monica*, No. 2:16-cv-06641-ODW
    (AFM), 2018 WL 1281772 (C.D. Cal. Mar. 9, 2018), *appeal pending*,
    No. 18-55367 (9th Cir. filed Mar. 21, 2018) ................................... 19-20, 32, 47

*HomeAway.com, Inc. v. City of Santa Monica*, No. 2:16-cv-06641-ODW
(AFM), 2018 WL 3013245 (C.D. Cal. June 14, 2018), *appeal pending*,
No. 18-55367 (9th Cir. filed Mar. 21, 2018) .................................................... 47

*Inman v. Technicolor USA, Inc.*, Civ. A. No. 11-666, 2011 WL 5829024
(W.D. Pa. Nov. 18, 2011) ................................................................ 45

*J.S., S.L. v. Vill. Voice Media Holdings, L.L.C.*, 359 P.3d 714 (Wash. 2015) ....... 56

*Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016) .................... 46

*Kimzey v. Yelp! Inc.*, 836 F.3d 1263 (9th Cir. 2016) ................................. 43, 44, 54

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) ................. 35

*Kwikset Corp. v. Superior Court of Orange Cty.*, 51 Cal. 4th 310 (2011) ............. 37

*Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723 (2000) ............................... 37

*Lussier v. San Lorenzo Valley Water Dist.*, 206 Cal. App. 3d 92 (1988) ............... 38

*Madison Third Bldg. Cos. v. Berkey*, 30 A.D.3d 1146 (N.Y. App. Div. 1st
Dep't 2006) ....................................................................... 34

*Martin Marietta Corp. v. Ins. Co. of N. Am.*, 40 Cal. App. 4th 1113 (1995) ......... 36

*Mazur v. eBay Inc.*, No. C 07-03967 MHP, 2008 WL 618988
(N.D. Cal. Mar. 4, 2008).................................................... 49

*McDonald v. LG Elecs. USA, Inc.*, 219 F. Supp. 3d 533 (D. Md. 2016)................ 32

*MDA City Apartments, LLC v. Airbnb, Inc.*, No. 17 CH 9980,
2018 WL 910831 (Ill. Cir. Ct. Feb. 14, 2018)................................... 46

*Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events LP*, No. CV
08-0856 DSF (RCx), 2009 WL 10671400 (C.D. Cal. Aug. 12, 2009) ............ 36

*NPS LLC v. StubHub, Inc.*, Civ.A. No. 06-4874-BLS1, 2009 WL 995483
(Mass. Super. Ct. Jan. 26, 2009)....................................... 49

*Nunes v. Twitter, Inc.*, 194 F. Supp. 3d 959 (N.D. Cal. 2016) ............................... 32

*Opperman v. Path, Inc.*, 84 F. Supp. 3d 962 (N.D. Cal. 2015) .............................. 56

*Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018 (N.D. Cal. 2014) ........................... 56

*Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708 (9th Cir. 2001)............. 57

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (1990) ................. 34

*Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874 (N.D. Cal. 2017), *appeal pending*, No. 17-17536 (9th Cir. filed Dec. 26, 2017) ..................................... 32

*Ralphs Grocery Co. v. United Food & Commercial Workers Union Local 8*, 113 Cal. Rptr. 3d 88 (Ct. App. 2010), *reversed on other grounds by* 55 Cal. 4th 1083 (2012) ........................................................................... 36

*Ramirez v. County of San Bernardino*, 806 F.3d 1002 (9th Cir. 2015).................. 43

*Reno v. ACLU*, 521 U.S. 844 (1997)........................................................................ 7

*Shamblin v. Berge*, 166 Cal. App. 3d 118 (1985).................................................. 34

*Stoner v. eBay, Inc.*, No. 305666, 2000 WL 1705637 (Cal. Super. Ct. Nov. 1, 2000) ......................................................................... 45

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 031063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .............................................. 6

*Upasani v. State Farm Gen. Ins. Co.*, 227 Cal. App. 4th 509 (2014).................... 36

*Xcentric Ventures, LLC v. Borodkin*, 798 F.3d 1201 (9th Cir. 2015).................... 49

STATUTES AND RULES

28 U.S.C. § 1291 ..................................................................................................... 4

28 U.S.C. § 1332(d)(2) ............................................................ 4

Telephone Consumer Protection Act of 1991,
    47 U.S.C. § 227 .................................................................. 32

Communications Decency Act,
    47 U.S.C. § 230 ........................................................... *passim*

        § 230(a) ............................................................... 47

        § 230(a)(3) ............................................................. 5

        § 230(c) ............................................................ 8, 48

        § 230(c)(1) ................................................... *passim*

        § 230(e)(3) ............................................................ 8

        § 230(f)(2) ............................................................ 8

        § 230(f)(3) ................................................... *passim*

Telecommunications Act of 1996,
    Pub. L. No. 104-104, 110 Stat. 56 ...................................... 7

California's Unfair Competition Law,
    Cal. Bus. & Prof. Code § 17200 *et seq.* ............................. 23, 36, 37

Fed. R. App. P. 4(a)(7)(B) ...................................................... 4

Fed. R. Civ. P. 12(b)(6) .......................................................... 4

Fed. R. Civ. P. 15(a)(2) .......................................................... 57


OTHER MATERIALS

141 Cong. Rec. H8460 (Aug. 4, 1995) ....................................... 5, 6, 47

H.R. Conf. Rep. No. 104-458 (1996)...................................................................... 6, 7

Restatement (Second) of Torts § 558 (1977)........................................................... 40

§ 559.................................................................... 40

## INTRODUCTION

This case concerns whether a provision of the Communications Decency Act ("CDA" or "Act"), 47 U.S.C. § 230, immunizes an online business from liability for conduct that would unquestionably subject that business to liability (and government regulation) if conducted outside the Internet. Appellant Aimco, an owner of residential apartment communities, brought this suit to stop Appellee Airbnb from interfering with leases that Aimco has with its tenants. Those tenants contract with Airbnb to rent out Aimco's properties to transient visitors, without Aimco's authorization and in violation of Aimco's leases with the tenants. Airbnb's conduct is actionable under a range of theories, and a brick-and-mortar real estate broker engaged in comparable conduct would have no federal preemption defense. Airbnb persuaded the district court on a motion to dismiss, however, that the CDA preempts Aimco's state-law claims.

The district court's judgment should be reversed. Congress enacted the CDA in 1996 to address the problem of readily available pornography on the nascent Internet. The Act aimed to encourage websites to monitor and remove offensive content. It accomplished that objective by preempting state-law claims that "treat[ ]" a website operator "as the publisher" of information posted by third parties, 47 U.S.C. § 230(c)(1), thereby enabling operators to remove harmful

content without becoming liable as the publishers of everything appearing on their sites.

As interpreted by this Court, § 230 preempts only those causes of action that "'inherently require[] the court to treat'" the defendant "'as a publisher'" of "material posted on the website by someone else." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016) (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009)). Claims that "derive liability" from conduct other than publishing are not preempted, *Barnes*, 570 F.3d at 1107, even if a website's publishing conduct is also "a 'but-for' cause of [the plaintiff's] injuries," *Internet Brands*, 824 F.3d at 853. In addition, § 230's preemption provision does not apply if the website operator "is 'responsible, in whole or in part, for the creation or development of' the offending content" appearing on its website. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc) ("*Roommates*") (quoting 47 U.S.C. § 230(f)(3)).

The district court's decision in this case disregards those governing principles and establishes a rule of decision that goes far beyond what Congress envisioned. The operative complaint alleges that the online property rental behemoth Airbnb knowingly brokers short-term rentals in Aimco's properties that violate Aimco's leases with tenants. Aimco's complaint premises liability on the suite of rental brokerage and other customer-support services that Airbnb provides

2

directly to its customers, as well as content that Airbnb creates. It does not premise liability on the display of user-created content on Airbnb's website and expressly disclaims such a theory.

The district court nevertheless deemed Aimco's complaint as "tak[ing] issue" with Airbnb's "publication" of user content. ER 11 (Minute Order Granting Defs.' Mot. to Dismiss (Dec. 29, 2017), ECF No. 55 ("Order")). In doing so, it erroneously treated the test for § 230 preemption as one of but-for causation, despite this Court's rejection of that standard in *Internet Brands*.

The district court also erroneously held that § 230 preempts claims based on Airbnb's own content "because no [listing] has any content until a user actively creates it." ER 8 (*Id.*) (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003)) (alteration in original). In reaching that conclusion, the court incorrectly relied on language in *Carafano* that the en banc Court in *Roommates* abrogated as "unduly broad." *Roommates*, 521 F.3d at 1171. As the *Roommates* Court explained, "[p]roviding immunity every time a website uses data initially obtained from third parties would eviscerate" the statutory language subjecting website operators to liability "for 'develop[ing]' unlawful content 'in whole or in part.'" *Id.* (quoting 47 U.S.C. § 230(f)(3)).

In short, the district court's decision erroneously treated § 230 as precisely what this Court has repeatedly held that it is not: "a general immunity from liability deriving from third-party content." *Barnes*, 570 F.3d at 1100.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2). On December 29, 2017, the court granted Airbnb's motion to dismiss all claims with prejudice under Federal Rule of Civil Procedure 12(b)(6). ER 1-13 (Order). Aimco timely filed a notice of appeal on January 26, 2018. ER 14-16 (Notice of Appeal, ECF No. 56); *see* Fed. R. App. P. 4(a)(7)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in concluding that 47 U.S.C. § 230(c)(1), which applies only to claims that "treat[ ]" websites "as the publisher" of information provided by users, preempts Aimco's claims based on the non-publishing services that Airbnb provides to induce and enable Aimco's tenants to rent their apartments to trespassing strangers in violation of the tenants' leases.

2.  Whether the district court erred in concluding that 47 U.S.C. § 230, which does not apply to claims based on content a website is "responsible" for "creat[ing] or develop[ing]" even "in part," *id.* § 230(f)(3), preempts Aimco's

claims alleging that Airbnb creates and develops content that allows Airbnb's customers to book and pay for property rentals in violation of Aimco's leases.

3.     Whether the district court erred in dismissing Aimco's complaint with prejudice where Aimco requested leave to amend and the district court gave no reason for denying it.

## STATUTE

47 U.S.C. § 230 is reproduced in an addendum to this brief.

## STATEMENT OF THE CASE

### A.     Statutory Context

In 1996, the Internet was an "absolutely brand-new technology," a "literal computer library" full of "potential . . . in terms of education and political discourse." 141 Cong. Rec. H8468-69 (Aug. 4, 1995) (statement of Rep. Cox).  But that library was also plagued with obscene and "offensive material . . . that our children ought not to see," *id.* at H8469 — material that threatened the Internet's potential as a "forum" for "political discourse," "cultural development," and "intellectual activity," 47 U.S.C. § 230(a)(3).  Congress considered various measures to address the "problem of . . . keeping pornography" and "offensive material away from our kids" so that "everyone in America" would "feel[ ] welcome" online.  141 Cong. Rec. H8469-70 (statement of Rep. Cox).

One concern was the "massive disincentive" in the "existing legal system" for online providers to police content on their platforms. *Id.* at H8469. Two court decisions exemplified the problem. *See id.* One held that an online provider that passively allowed users to post defamatory material was akin to a library, which generally cannot be held liable for the contents of publications that it innocently distributes. *See id.* (discussing *Cubby, Inc. v. CompuServe Inc.*, 776 F. Supp. 135, 139-40 (S.D.N.Y. 1991)). The other held that an online network that monitored and removed offensive content so as to offer "family-friendly" web-surfing was akin to a newspaper publisher and subject to defamation liability for material that it did not remove. *See id.* at H8469-70 (discussing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 031063/94, 1995 WL 323710, at *5 (N.Y. Sup. Ct. May 24, 1995)). Members of Congress thought that it was "backward," *id.* at H8470, to hold platforms that tried to remove obscene content liable for posts that they missed, while giving those that "bur[ied] their heads in the sand" a free pass, *Roommates*, 521 F.3d at 1163.

The provision that became § 230 was proposed to "overrule *Stratton-Oakmont*," H.R. Conf. Rep. No. 104-458, at 194 (1996), and to allow online platforms to "perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete," *Roommates*, 521 F.3d at 1163. The Conference Report described

6

the proposed provision as creating "'Good Samaritan' protections from civil liability for providers or users of an interactive computer service for actions [taken] to restrict or to enable restriction of access to objectionable online material." H.R. Conf. Rep. No. 104-458, at 194. Although the Conference Report referred to preempting liability for providers that edit user-generated content as "[o]ne of the specific purposes" of the provision, *id.*, this Court has recognized that overruling *Stratton Oakmont* "seems to be the principal or perhaps the only purpose," because the Report does not describe any other purposes "beyond supporting 'the important federal policy of empowering parents to determine the content of communications their children receive through interactive computer services,'" *Roommates*, 521 F.3d at 1163 & n.12 (quoting H.R. Conf. Rep. No. 104-458, at 194).

The proposed "Good Samaritan" provision was ultimately enacted as part of the CDA and codified at 47 U.S.C. § 230.[1] Section 230(c), the provision at issue in this case, is titled "Protection for 'Good Samaritan' blocking and screening of

---

[1] The CDA was one portion (Title V) of the much larger Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 133-43. The Supreme Court has observed that, whereas most of the Telecommunications Act was "the product of extensive committee hearings" and congressional reports, the CDA "contains provisions that were either added in executive committee after the hearings were concluded or as amendments offered during floor debate on the legislation." *Reno v. ACLU*, 521 U.S. 844, 858 & n.24 (1997); *see also* Robert Cannon, *The Legislative History of Senator Exon's Communications Decency Act: Regulating Barbarians on the Information Superhighway*, 49 Fed. Commc'ns L.J. 51, 67-69, 91-92 (1996).

offensive material." 47 U.S.C. § 230(c). It states in pertinent part: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1).[2]

This Court applies a three-part test for determining whether § 230 preempts a state-law cause of action: "subsection (c)(1) precludes liability for '(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider.'" *Internet Brands*, 824 F.3d at 850 (quoting *Barnes*, 570 F.3d at 1100-01). With respect to the first element, this Court has interpreted the statutory definition of "interactive computer service," 47 U.S.C. § 230(f)(2), to include "websites," *see Roommates*, 521 F.3d at 1162 n.6. The second and third elements are at issue in this appeal.

---

[2] Section 230 also contains a savings clause and an express preemption provision. The savings clause provides that "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section." 47 U.S.C. § 230(e)(3). The express preemption provision states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.*

## B. Factual Background

### 1. Airbnb's brokerage services

Airbnb is "in the business of providing rental brokerage and booking services for short-term rental transactions between owners or renters of property and prospective tourists or transient users of property."[3] Its estimated value exceeds $30 billion,[4] and it projects that its annual profits will top $3 billion by 2020.[5] As of December 2017, Airbnb's website offered more than 4 million properties for rent; during 2017, Airbnb brokered "[m]ore than 1.3 million guest arrivals" in Los Angeles alone.[6]

Airbnb provides a full range of brokerage services to facilitate, promote, and support short-term rentals — transactions that are often prohibited by property

---

[3] ER 226 (First Am. Compl. ¶ 10 (June 6, 2017), Ex. A to Notice of Removal (filed July 3, 2017), ECF No. 01-01 ("Compl.")).

The Court assumes the truth of Aimco's factual allegations. *See*, *e.g.*, *Barnes*, 570 F.3d at 1098 n.1. For additional context, and in support of its argument that the district court erred in dismissing the complaint with prejudice, this section also refers to factual materials submitted in connection with Aimco's motion for a preliminary injunction, as well as publicly available information regarding Airbnb's business.

[4] *See* Greg Bensinger, *Airbnb Valued at $31 Billion After New Funding Round*, Wall St. J. (Mar. 9, 2017), https://www.wsj.com/articles/airbnb-valued-at-31-billion-after-new-funding-round-1489086240.

[5] *See* Leigh Gallagher, *Airbnb's Profits to Top $3 billion by 2020*, Fortune (Feb. 15, 2017), http://fortune.com/2017/02/15/airbnb-profits/.

[6] *See* ER 47 (Decl. of Airbnb Executive Alex Ward in Supp. of Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj. ¶ 5 (Dec. 8, 2017), ECF No. 50 ("Ward Decl.")).

owners and local laws. *See*, *e.g.*, ER 226-230, 232, 241 (Compl. ¶¶ 10-23, 27, 35, 70). As described below, tenants wishing to rent their apartments need only provide basic information about a property, and Airbnb handles the rest, including scheduling and confirming reservations; sending the property address to the traveler after a reservation is paid for; accepting, holding, and delivering payment to tenants; calculating, collecting, and remitting applicable taxes; mediating and deciding disputes; providing insurance; paying for property damage; and allowing tenants and travelers to communicate without sharing personal information. Airbnb has characterized those "booking, calendaring, and payment processing services" as "fundamental" aspects of its "business model," emphasizing that it provides those services "in connection with *all* of the listings on its platform." ER 49 (Ward Decl. ¶ 33).

Airbnb's brokerage services include the following:

***Listing Services.*** Airbnb solicits information from Aimco's tenants to create listings for their properties. ER 226-227 (Compl. ¶ 12). Airbnb assures tenants that its "content strategy team" is "there every step of the way" to help tenants offer "the kind of hospitality our guests look for."[7] A tenant who wants to list a

---

[7] ER 72 (Decl. of Michael T. Williams (Oct. 18, 2017), ECF No. 23-17 ("Williams Decl.")); ER 103-104 (Ex. N to Williams Decl., ECF No. 23-31).

property on Airbnb begins by filling out a series of forms on Airbnb's website with check boxes for property features and amenities, such as the number of bathrooms and the availability of a hair dryer, pool, or gym.[8] The tenant must also upload a photo of the property. ER 226-227 (Compl. ¶ 12). Airbnb offers to connect tenants with professional photographers, ER 227 (*Id.* ¶ 17); ER 108-111 (Williams Decl. Ex. O, ECF No. 23-32); it will "pay for that photography" in some markets, ER 113 (Williams Decl. Ex. V, ECF No. 23-39) (quoting Airbnb's website); and it displays photos taken by Airbnb-provided photographers as "[v]erified," ER 56 (Airbnb's Terms of Service ¶ 5.6, Ward Decl. Ex. A, ECF No. 50-01 ("TOS")). Airbnb also enables tenants to feature their properties as suitable for business travelers[9] or as properties that Airbnb has "[v]erified for quality" — such as offering "excellent bath products" and "[p]lenty of towels and fluffy pillows" — according to a "100+ point quality inspection."[10]

---

[8] ER 175-176 (Decl. of Anthony Tanner ¶¶ 51-53 (Oct. 18, 2017), ECF No. 23-8 ("Tanner Decl.")); ER 179-206 (Tanner Decl. Ex. E, ECF No. 23-13). Airbnb also offers to connect new hosts with a "mentor." ER 210 (Tanner Decl. Ex. G, ECF No. 23-15).

[9] *See* Homes For Work Trips, https://bit.ly/2sNZiLB (shortened URL for Airbnb website, last accessed June 22, 2018).

[10] Airbnb Plus Homepage, https://www.airbnb.com/plus (last accessed June 22, 2018).

Using the information solicited from the tenant, Airbnb creates a "listing" for advertisement on Airbnb's website.  ER 226-227 (Compl. ¶ 12).  The "listing" is not a passive display of the tenant's description of the property, akin to a newspaper advertisement for an apartment to rent.  Rather, Airbnb incorporates the tenant's property description into a series of pages in a standard format that also displays Airbnb's content,[11] such as its booking, payment, and messaging tools, as shown in the following listing[12]:

---

[11] ER 55 (TOS § 5.1) (defining "Member Content," "Airbnb Content," and "Collective Content").

[12] *See* Spacious Penthouse At The Grove Stunning Views, https://bit.ly/2l5lIna (shortened URL for Airbnb website, last accessed June 14, 2018).  Aimco's counsel entered the number of guests and the desired dates into the booking box on the right.  According to the listing, "Kelly" is the property manager of "Laura's place."



Airbnb does not charge fees for creating and displaying rental listings on its website. ER 227 (Compl. ¶ 13). Instead, like a traditional rental broker, Airbnb collects percentage commissions from tenants and travelers, ER 227 (*id*. ¶ 14), which are 3-5% for hosts and up to 15% for guests, ER 100 (Williams Decl. Ex. M, ECF No. 23-30).

***Booking Services.*** Airbnb books short-term rentals. The tenant enters the dates on which the property is available to rent into Airbnb's "calendaring service." ER 47, 49 (Ward Decl. ¶¶ 8, 33). The tenant also chooses either a set

price (Airbnb suggests one based on its market data) or a range of prices, in which case Airbnb's "Smart Pricing" tool will automatically drop the price in low-demand times and increase the price when rooms are scarce. ER 227 (Compl. ¶ 18); ER 89 (Williams Decl. Ex. D, ECF No. 23-21) (Airbnb website: "When you create a listing on Airbnb, we suggest a price for your property based on your location and other factors.").

A traveler seeking to book a rental enters the dates she wants to stay in the Airbnb's booking box in the listing. Like a brick-and-mortar real estate broker, Airbnb determines whether the property is available and, if so, the cost of the rental including applicable taxes and Airbnb's fees. ER 226-227 (Compl. ¶¶ 12, 14); ER 47 (Ward Decl. ¶ 8); ER 96-98 (Williams Decl. Ex. K, ECF No. 23-28).

***Payment Services.*** Airbnb provides a suite of payment services to effectuate short-term rental transactions. ER 227 (Compl. ¶ 16).[13] Airbnb collects funds from the traveler "when a reservation is made." ER 89 (Williams Decl. Ex. D) (Airbnb website). After the rental period begins, Airbnb delivers a "payout" to the tenant, consisting of the payment collected less applicable taxes and Airbnb's fees.

---

[13] *See* ER 85 (Williams Decl. Ex. B, ECF No. 23-19) (Airbnb promotional document: "Guests are required to pay through Airbnb's secure payment platform when they book a listing"); ER 88-89 (Williams Decl. Ex. D) (Airbnb website: "Airbnb's secure payment system means you never have to deal with money directly"; and "[a]ll payments are processed securely through Airbnb's online payment system").

ER 89 (*Id.*); ER 227 (Compl. ¶ 17); ER 133, 136 (Airbnb's Payment Terms of Service §§ 7.1, 7.2.1, 7.2.2, 11.1, Williams Decl. Ex. SS, ECF No. 23-61 ("PTOS")). If the traveler cancels before the reservation date, Airbnb issues any refunds due according to Airbnb's and the tenant's cancellation policies. ER 133-135 (PTOS §§ 7.3.2, 10.2); *see* ER 59 (TOS § 9.5) (providing Airbnb the right to cancel a confirmed booking in certain circumstances).

*Insurance and Dispute-Resolution Services.* Airbnb provides numerous services to address disputes between tenants and travelers. For tenants, Airbnb provides $1 million of liability insurance[14] and a "Host Guarantee" to cover property damage of up to $1 million.[15] For travelers, Airbnb provides a "Guest Refund Policy" under which travelers can obtain reimbursement for amounts paid to Airbnb if they are unable to obtain access to the property or experience other "travel issue[s]." ER 228 (Compl. ¶ 20); ER 124 (Williams Decl. Ex. OO, ECF No. 23-57) (terms of Airbnb's Guest Refund Policy "supersede" tenants' cancellation policies).

---

[14] ER 228 (Compl. ¶ 19); ER 120 (Williams Decl. Ex. LL, ECF No. 23-54) (Airbnb's "Host Protection Insurance program provides primary liability coverage for up to $1 million per occurrence" for "third party claims of bodily injury or property damage").

[15] ER 116-118 (Williams Decl. Ex. KK, ECF No. 23-53) (describing Host Guarantee).

Airbnb also requires tenants and travelers to agree to participate in mediation conducted by Airbnb or a mediator of its choosing to resolve property-damage claims. ER 60 (TOS § 11.3). In addition, travelers authorize Airbnb to charge their payment method on file if "Airbnb determines in its sole discretion" that the traveler is responsible for property damage. ER 60 (TOS § 11.2); ER 136 (PTOS § 12.1). Travelers also authorize Airbnb to seek reimbursement from the traveler's homeowner's or other insurance policy. ER 60 (TOS § 11.4). When travelers overstay their rental period, Airbnb charges their credit cards according to Airbnb's overstay policy. ER 58 (TOS § 8.2.2); ER 134 (PTOS § 8.6). If travelers fail to pay, Airbnb engages in collection efforts to recover unpaid amounts. ER 135-136 (PTOS § 10.8).

***Communications Services.*** Airbnb enables tenants to advertise, book, and pay for rentals without revealing their identities or locations. ER 233-234 (Compl. ¶¶ 44-45). Airbnb does not display property addresses on its website and provides a traveler with an apartment's exact location only after the reservation is booked. ER 92 (Williams Decl. Ex. H, ECF No. 23-25). Indeed, Airbnb requires its customers to conceal property locations: "[c]ontent that is sufficient to identify a listing's location" violates Airbnb's content policy,[16] and Airbnb removes

---

[16] What is Airbnb's Content Policy?, https://www.airbnb.com/help/article/546/what-is-airbnb-s-content-policy (last accessed June 18, 2018).

16

user-provided content that violates this policy, ER 56 (TOS § 5.8); ER 214 (Tanner Decl. Ex. H, ECF No. 23-16) (email from Airbnb to user stating that Airbnb had removed a user-provided photo that violated Airbnb's prohibition on "direct contact information," including "addresses").

Airbnb also maintains "a smart messaging system" so that tenants and travelers can "communicate with certainty." ER 227 (Compl. ¶ 16) (quoting Airbnb's website). The system forwards messages to customers' personal email accounts, so tenants can appear only as a first name and profile photo while "[k]eeping [their] real personal email address hidden." ER 129 (Williams Decl. Ex. RR, ECF No. 23-60) (quoting Airbnb's website); ER 93-95 (Williams Decl. Ex. I, ECF No. 23-26).

Airbnb's communications services reduce the inherent risk of renting to strangers and, for those renting properties unlawfully, dramatically reduce the risk of detection. *See Airbnb, Inc. v. City & Cty. of San Francisco*, 217 F. Supp. 3d 1066, 1070 (N.D. Cal. 2016) (city enforcement of short-term rental ordinance is "hampered" when websites like Airbnb enable rentals while concealing addresses and contact information).[17]

---

[17] *See* Benjamin G. Edelman & Abbey Stemler, *From the Digital to the Physical: Federal Limitations on Regulating Online Marketplaces* 15-16, 27 (Jan. 31, 2018) (Harv. Bus. Sch. NOM Unit Working Paper, Paper No. 18-063), Harv. J. on Legis. (forthcoming), https://ssrn.com/abstract=3106383.

### 2. Neighbors and communities struggle to deal with Airbnb

Airbnb's turnkey services make it easy for tenants to rent their apartments to strangers: all tenants need to do is provide basic property information, and Airbnb handles the booking, payment, insurance, and disputes. That makes Airbnb attractive to individuals renting out their homes, as well as commercial "hosts" renting multiple properties on a full-time basis.[18] For example, an investigation by the New York Attorney General found that 6% of Airbnb hosts account for 36% of private listings, many of which are vacant when not rented through Airbnb.[19]

As Airbnb and its customers have profited, neighbors and communities have frequently suffered. Communities are hurt as short-term rentals reduce the stock of rental housing and increase housing prices.[20] Neighbors suffer because travelers

---

[18] *See* Br. *Amicus Curiae* of Unite Here International Union in Supp. of Def./Appellee City of Santa Monica at 4-9, *HomeAway.com, Inc. v. City of Santa Monica*, No. 18-55367 (9th Cir. filed May 23, 2018), ECF No. 42 ("*HomeAway Appeal*").

[19] *See* OFFICE OF N.Y. ATT'Y GEN. ERIC SCHNEIDERMAN, *Airbnb in the City* at 2-3 (Oct. 2014) (also finding that 38% of units on Airbnb are used for "short-term rentals for more than half the year"), https://ag.ny.gov/pdfs/AIRBNB%20 REPORT.pdf.

[20] *See* David Wachsmuth et al., *The High Cost of Short-Term Rentals in New York City* at 2, URB. POL. & GOVERNANCE RES. GRP. (Jan. 30, 2018) (finding that Airbnb has reduced housing supply and increased median rent), https://mcgill.ca/ newsroom/files/newsroom/channels/attach/airbnb-report.pdf; *Short-Term Rentals, Long-Term Impacts: The Corrosion of Housing Access and Affordability in New Orleans* at 3-4, JANE PLACE NEIGHBORHOOD SUSTAINABILITY INITIATIVE (Mar.

who will be gone in the morning have little reason to care about maintaining friendly and respectful relations with neighbors. Some travelers book Airbnb units for the specific purpose of loud parties, prostitution, and drug use. ER 231-232 (Compl. ¶¶ 31-34). Residents of Appellants' properties have complained that Airbnb guests are "generally disruptive and disrespectful" and that the unauthorized use of Airbnb is "destroying," "degrading," and "ruining" their communities.[21] And even the best-behaved guests cannot replicate what is lost when neighbors are replaced by a revolving cast of vacationers: as one long-term resident whose L.A. neighborhood had become popular on Airbnb put it, "I have no real neighbors anymore."[22]

Victims of the short-term rental boom have struggled to respond. Cities seeking to stop the conversion of full-time housing stock have enacted laws governing where, how frequently, or for how long units may be rented — only to have those ordinances challenged in court by Airbnb and other short-term rental brokers. *See*, *e.g.*, *Airbnb*, 217 F. Supp. 3d at 1070 (San Francisco requires Airbnb hosts to be a "permanent resident[ ]" and to register with the city); *HomeAway.com,*

---

2018), https://www.documentcloud.org/documents/4421169-Short-Term-Rentals-Long-Term-Impacts-the.html.

[21] Pls.' Notice of Mot. & Mot. for Prelim. Inj.; Mem. of Points & Authorities in Supp. Thereof at 8-10 (Oct. 18, 2017), ECF No. 23 ("Pls. Prelim. Inj. Mem."); *see also* ER 232-233 (Compl. ¶¶ 37-43).

[22] ER 163 (Williams Decl. Ex. HHH, ECF No. 23-76).

19

*Inc. v. City of Santa Monica*, No. 2:16-cv-06641-ODW (AFM) ("*HomeAway*"),

2018 WL 1281772, at *1 (C.D. Cal. Mar. 9, 2018) (Santa Monica prohibits

vacation rentals where the host does not remain in the property), *appeal pending*,

No. 18-55367 (9th Cir. filed Mar. 21, 2018).

In addition, many property owners have sought to offer their residents a

quiet, safe, Airbnb-free community through lease conditions prohibiting short-term

rentals. Appellants are among such property owners. ER 230 (Compl. ¶¶ 27-28).

### 3. Airbnb knowingly brokers short-term rentals that violate Aimco's leases

Appellants (referred to collectively as "Aimco"[23]) own several rental

communities in Los Angeles County and manage those communities to protect

residents' safety and quality of life. ER 229 (Compl. ¶¶ 24-25). Every tenant's

lease includes a clause that prohibits the tenant from renting the apartment through

Airbnb or similar services. ER 230 (*Id.* ¶ 27).[24]

---

[23] Appellants are LA Park LA Brea A LLC, LA Park La Brea B LLC,
LA Park La Brea C LLC, and Aimco Venezia, LLC. ER 223-225 (Compl. ¶¶ 1-4).
Apartment Investment and Management Company ("Aimco") is Appellants' parent
company. ER 234 (*Id.* ¶ 45).

[24] The provision in Aimco's standard form lease states as follows:

> Resident shall not sublet the Apartment or assign this Lease
> for any length of time, including, but not limited to, renting
> out the Apartment using a short term rental service such as
> airbnb.com, VBRO.com or homeaway.com. Any purported
> assignment or sublet of this Lease or the Apartment Home

Airbnb has brokered hundreds of rentals that violate that lease provision —
and municipal law[25] — causing many of the problems for which Airbnb has
become notorious. ER 232 (*Id*. ¶ 37). Airbnb guests have held loud, late-night
parties, gotten into fights, and ignored rules governing community amenities. ER
230-231, 233 (*Id*. ¶¶ 29, 38-43). Frustrated residents have moved out, and Aimco
has been forced to hire additional security, repair property damage, and incur other
costs. ER 230-231, 233 (*Id*. ¶¶ 29, 42-43). Although Aimco has committed
extensive resources to trying to identify the tenants who are renting their units on
Airbnb, Airbnb's anonymous platform makes it extremely difficult to do so. ER
233-234 (*Id*. ¶¶ 44-45).

In 2016, Aimco requested Airbnb's help in preventing unlawful short-term
rentals in Aimco's properties. ER 234-236 (*Id*. ¶¶ 45-52). After being advised by
Airbnb that it would help reduce short-term rental activity, Aimco provided a copy
of its standard lease agreement, and it identified listings suspected of being Aimco

---

without the prior written consent of [the] Landlord is null
and void.

ER 230 (Compl. ¶ 27).

[25] Rentals of less than 30 days in Aimco's properties violate the Los Angeles
zoning code. *See* ER 18-19 (Suppl. Decl. of Michael T. Williams ¶¶ 21-25, Ex. 6
of Pls.' Reply in Supp. of Mot. for Prelim. Inj., ECF No. 54-1 ("Williams Suppl.
Decl.")); ER 21-26 (Williams Suppl. Decl. Ex. D, ECF No. 54-5); ER 27-32
(Williams Suppl. Decl. Ex. E, ECF No. 54-6); ER 33-38 (Williams Suppl. Decl.
Ex. F, ECF No. 54-7); ER 39-44 (Williams Suppl. Decl. Ex. G, ECF No. 54-8).

apartments rented unlawfully through Airbnb. ER 234-235 (*Id*. ¶ 49). Despite its earlier assurances, Airbnb refused to stop brokering prohibited rentals in Aimco's properties. ER 235 (*Id*. ¶¶ 50-51). Airbnb advised Aimco that Airbnb could provide some "transparency into home sharing activity in a building" and permit some control over rental activity, but only if Aimco agreed to allow Airbnb rentals. ER 229, 234 (*Id*. ¶¶ 23, 46-47). Airbnb continues to broker rentals in violation of Aimco's leases, and travelers booking rentals through Airbnb continue to cause problems for Aimco and its rule-abiding residents. ER 236 (*Id*. ¶¶ 53-54).

## C.    Procedural History

In February 2017, Aimco commenced an action in California Superior Court against Airbnb, Inc. and Airbnb Payments, Inc. (referred to collectively as "Airbnb").[26] In June 2017, it filed an amended complaint seeking relief on behalf of a class of similarly situated property owners. ER 221-253 (Compl.). The operative complaint seeks relief for Airbnb's brokering of short-term rentals at Aimco's properties over Aimco's repeated objections and in violation of Aimco's leases. ER 230, 232, 239 (*Id*. ¶¶ 27, 37, 62-64). The complaint pleads California statutory and common-law causes of action for tortious interference with contract, intentional and negligent interference with prospective economic advantage, unjust

---

[26] ER 254-267 (Original Compl. (Feb. 14, 2017), Ex. C to Notice of Removal (filed July 3, 2017), ECF No. 01-03) (removal from *La Park La Brea A LLC v. Airbnb, Inc.*, No. BC650575 (Cal. Super. Ct., L.A. Cty.)).

enrichment, trespass, aiding and abetting trespass, private nuisance, and violation of California Business & Professions Code § 17200 *et seq.*, governing unfair and deceptive business practices. ER 243-249 (Compl. ¶¶ 82-137).

Aimco's claims are "premised on Airbnb's own conduct as a rental broker that knowingly and wrongfully induces breaches of existing contracts, interferes with Plaintiffs' prospective economic advantage, and violates Plaintiffs' property rights." ER 239 (*Id*. ¶ 63). The complaint requests damages and equitable relief, including an injunction prohibiting Airbnb from "entering into short-term rental transactions" with tenants and travelers seeking to rent Aimco's apartments and from "processing payments for the rental of" its apartments. ER 239 (*Id*. ¶ 64). The complaint disclaims liability arising from "third-party content [that Airbnb] may have published on its website." ER 239 (*Id.*).

After Aimco filed the amended complaint, Airbnb removed the action to federal district court and moved to dismiss.[27] As relevant here, Airbnb argued that Aimco's claims are "preempted by" § 230 because its brokerage and booking services are "inextricably intertwined with" the "publishing [of] third-party listings" for short-term rentals. MTD at 20, 24.

---

[27] *See* Defs.' Notice of Mot. & Mot. to Dismiss First Am. Compl.; Mem. of Points & Authorities in Supp. Thereof (Aug. 7, 2017), ECF No. 16 ("MTD").

In opposition, Aimco explained that § 230, as interpreted by this Court, does not preempt Aimco's claims for two independent reasons.[28] *First*, none of Aimco's claims "treat[s]" Airbnb as a "publisher" of third-party content. 47 U.S.C. § 230(c)(1). On the contrary, Aimco seeks to hold Airbnb responsible for the wide range of brokerage services that Airbnb provides to Aimco's tenants, not for publishing third-party content. *See* Pls. Opp'n at 24. *Second*, § 230 "applies only if the interactive computer service provider is not also an 'information content provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content." *Roommates*, 521 F.3d at 1162 (quoting 47 U.S.C. § 230(f)(3)). Aimco's claims are not preempted because Aimco seeks to hold Airbnb liable as an 'information content provider of *Airbnb's own* "offending content" that interferes with Aimco's contractual and property rights. Pls. Opp'n at 24.[29] Aimco requested leave to amend if the court dismissed any of its claims. *See id.* at 25.

---

[28] *See* Pls.' Opp'n to Defs.' Mot. to Dismiss First Am. Compl. at 23-25 (Sept. 27, 2017), ECF No. 20 ("Pls. Opp'n").

[29] In October and November 2017, Aimco moved for preliminary injunctive relief from the irreparable harm to its business resulting from Airbnb's ongoing tortious conduct and sought limited discovery in support of that motion. *See* Pls. Prelim. Inj. Mem.; Pls.' Notice of Mot. & Mot. for Limited Expedited Disc.; Mem. of Points & Authorities in Supp. Thereof (Nov. 7, 2017), ECF No. 41. After granting Airbnb's motion to dismiss, the district court denied those motions as moot. ER 1-2, 12-13 (Order).

In December 2017, the district court granted Airbnb's motion to dismiss, holding that § 230 preempts Aimco's claims. ER 1-13 (Order). The court acknowledged Aimco's argument that the complaint "is not premised on the Airbnb listings, but on Airbnb's own misconduct — contracting with Aimco's tenants (or failing to refrain from contracting with Aimco's tenants) and processing payments for rentals of Aimco-owned apartments," ER 9 (*id.*), among other misconduct, ER 2-3 (*id.*) (recounting complaint's allegations regarding the numerous services Airbnb provides "[t]o encourage and facilitate booking"). But the court nevertheless concluded that "it is with Airbnb's publication of this content [i.e., listings] that Aimco takes issue." ER 11 (*Id.*). The court did not explain that conclusion, except to state without elaboration that Aimco had sought "to plead around the CDA." ER 11 (*Id.*); *see* ER 9 (*id.*) (stating "'creative pleading' does not place this case outside the CDA's purview") (quotation omitted). The court also cited out-of-circuit cases that it read as having "come out the same way with respect to the CDA's coverage on analogous facts." ER 10 (*Id.*); *see* ER 9 (*id.*) (asserting that "[c]ourts have granted CDA protection to websites that process payments").

The district court also held that Airbnb could not be subject to liability as an information content provider for information that Airbnb itself created. ER 7-8 (*Id.*). Relying on language in *Carafano* that this Court abrogated as "unduly

broad" in *Roommates*, 521 F.3d at 1171, the district court reasoned that, "because no [listing] has any content until a user actively creates it," Airbnb is not an information content provider, and § 230 preempts Aimco's claims based on Airbnb's content, ER 8 (Order) (alteration in original).

## SUMMARY OF ARGUMENT

The district court erred in granting Airbnb's motion to dismiss Aimco's claims as preempted by the Communications Decency Act, 47 U.S.C. § 230. By its plain terms, § 230 preempts only claims that "treat[]" a defendant like Airbnb "as the publisher or speaker of any information provided by another information content provider." *Id*. § 230(c)(1). Thus, § 230 does not preempt a claim if either: (1) the claim premises liability on conduct other than publishing or (2) the claim premises liability on the defendant's own information content, not content wholly provided by a user. The district court erred in dismissing Aimco's complaint under § 230 because Aimco's claims seek to hold Airbnb liable for its non-publishing brokerage services and for content of Airbnb's own creation.

**I.** Section 230 does not apply here because Aimco's claims derive liability from Airbnb's brokerage services, not publishing. A claim "treats" a defendant "as the publisher" if it "derive[s] liability from behavior that is identical to publishing" user content. *Barnes*, 570 F.3d at 1100-02, 1107. Section 230 does not preempt a claim merely because publication of user content is a but-for cause

26

of the plaintiff's injury. *See Internet Brands*, 824 F.3d at 853. The district court failed to follow *Barnes* and *Internet Brands*. Instead, although the court recognized that Aimco's claims for relief in its operative complaint were based on Airbnb's non-publishing conduct — its rental brokerage services — it nevertheless dismissed Aimco's complaint based on its unexplained assertion that Aimco "t[ook] issue" with Airbnb's publication of rental listings. ER 11 (Order). Compounding the error, the district court relied on a superseded complaint and off-point, out-of-circuit decisions.

**II.** In addition, § 230 does not preempt liability based on Airbnb-created content — the online tools and information Airbnb provides that induce and enable tenants to take advantage of Airbnb's brokerage services — because Airbnb is "responsible" for the "creation or development" of that content. 47 U.S.C. § 230(f)(3). Airbnb's content makes it possible for Aimco's tenants to book unauthorized rentals while evading detection, and therefore "contributes materially to the alleged illegality." *Roommates*, 521 F.3d at 1168. In reaching a contrary conclusion, the district court relied on "unduly broad" language from an earlier decision that the en banc Court in *Roommates* expressly abrogated. *Compare* ER 7-8 (Order) (relying on *Carafano*, 339 F.3d at 1124) *with Roommates*, 521 F.3d at 1171 (abrogating *Carafano* in relevant part).

27

**III.** In any event, the district court abused its discretion in dismissing the complaint with prejudice because it offered no reason for rejecting Aimco's request for leave to amend.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision to grant a motion to dismiss. *See Internet Brands*, 824 F.3d at 849. The failure to grant leave to amend is reviewed for abuse of discretion. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (per curiam).

## ARGUMENT

**I.    SECTION 230 DOES NOT PREEMPT AIMCO'S COMPLAINT BECAUSE THE CLAIMS DO NOT "TREAT" AIRBNB "AS THE PUBLISHER" OF USER CONTENT**

### A.    Section 230 Preempts Only Claims That Derive Liability From Publishing

**1.** Section 230(c)(1) preempts only "certain kinds of lawsuits": those that would "treat[ ]" a website operator "as the publisher or speaker of any information provided by another information content provider." *Barnes*, 570 F.3d at 1099-1100 (quoting 47 U.S.C. § 230(c)(1)) (emphasis omitted). To determine whether a claim "treat[s]" a provider "as the 'publisher,' " this Court looks to "whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher.' " *Id.* at 1102. "[P]ublication," this Court has explained, "involves reviewing, editing, and deciding whether to publish

28

or to withdraw from publication third-party content." *Id.* Thus, "[a] clear illustration of a cause of action that treats a website proprietor as a publisher is a defamation action founded on the hosting of defamatory third-party content." *Internet Brands*, 824 F.3d at 851.

This Court has also held that § 230 does *not* apply to every case in which publishing activity "could be described as a 'but-for' cause of [the plaintiff's] injuries." *Id.* at 853. Because "[p]ublishing activity is a but-for cause of just about everything" online companies do, *id.*, more is required to trigger preemption under § 230. For § 230 to preempt a claim, the "*duty*" alleged to have been violated must "derive[] from" publishing. *Barnes*, 570 F.3d at 1102 (emphasis added). Otherwise, § 230 would provide "an all purpose get-out-of-jail-free card for businesses that publish user content on the internet," *Internet Brands*, 824 F.3d at 853 — a result this Court has repeatedly rejected. *See Barnes*, 570 F.3d at 1100 (§ 230 does not "declare[] a general immunity from liability deriving from third-party content"); *Roommates*, 521 F.3d at 1164 (§ 230 "was not meant to create a lawless no-man's-land on the Internet").

**2.** *Barnes* and *Internet Brands* illustrate the proper application of § 230. In *Barnes*, a woman whose ex-boyfriend maliciously created a fake Yahoo profile for purposes of harassing her brought suit against Yahoo for promising to remove the profile, but failing to do so. *See* 570 F.3d at 1098-99. She alleged two

theories:  negligent undertaking and promissory estoppel.  *See id.* at 1102-03,
1106.  This Court held that the negligent-undertaking claim was preempted
because it alleged that Yahoo had undertaken to remove content and failed to do so
with due care — a claim that "necessarily involves treating the liable party as a
publisher of the content it failed to remove."  *Id.* at 1103.

In contrast, § 230 did not bar the promissory-estoppel claim because that
claim derived liability from "Yahoo's manifest intention to be legally obligated to
do something, which happens to be removal of material from publication."  *Id.* at
1107.  Section 230 did not apply even though the promise was "to take down third-
party content from [Yahoo's] website, which is quintessential publisher conduct."
*Id.*  The "difference" was that, unlike the negligent-undertaking claim, the
promissory-estoppel claim did not "derive liability from behavior that is identical
to publishing or speaking."  *Id.*  The "legally significant event" from which
liability derived was the failure to honor a promise, *id.*, not publishing.

In *Internet Brands*, this Court reaffirmed that the "essential question" for
determining whether § 230 bars a claim is whether the claim " 'inherently
requires' " the defendant to be treated as the publisher of user content.  824 F.3d at
850 (quoting *Barnes*, 570 F.3d at 1102).  The plaintiff in *Internet Brands* was a
model who was raped by fake "talent scouts" she met through a modeling website.
*Id.* at 848-49.  She brought a failure-to-warn suit against the website company,

30

alleging that the website's operators knew and should have warned her that the rapists had previously used the site to lure their victims. *See id.* at 850-51. This Court reversed the dismissal of the complaint because the plaintiff's claim was premised on the website's failure to warn her, and not the content published by the provider. *See id.* at 851. Section 230 did not apply — even though the defendant could have satisfied its duty to warn by "posting a notice on the website," which "could be deemed an act of publishing information." *Id.*; *see also Beckman v. Match.com, LLC*, 668 F. App'x 759, 759 (9th Cir. 2016) (mem.) (reversing dismissal of failure-to-warn claim under *Internet Brands*).

      **3.**      Other circuits have similarly recognized that § 230's preemptive scope is limited to claims deriving liability from publishing user content. The Seventh Circuit held that § 230 did not prevent the City of Chicago from enforcing an ordinance requiring ticket "reseller's agent[s]," including websites publishing third-party ticket advertisements, to collect and remit ticket taxes. *City of Chicago v. StubHub!, Inc.*, 624 F.3d 363, 365 (7th Cir. 2010). StubHub, one such website, argued that enforcing the ordinance would treat it as a publisher of users' ticket advertisements. *Id.* The Seventh Circuit held § 230 was "irrelevant" because the duty imposed by the ordinance "does not depend on who 'publishes' any information." *Id.* at 366; *see also FTC v. LeadClick Media, LLC*, 838 F.3d 158,

176-77 (2d Cir. 2016) (recognizing that § 230 does not bar claims based on non-publishing conduct).[30]

    **4.**     By looking to the act from which liability derives and not the potential publishing effects of that liability, this Court's approach comports with the Supreme Court's rejection of an "effects-based test" for preemption in *Bates v. Dow AgroSciences LLC*, 544 U.S. 431, 445 (2005). *Bates* rejected an argument that a federal statute preempting state pesticide labelling requirements applied to any cause of action that would give a company "a 'strong incentive' to change its label." *Id.* at 436. The Supreme Court dismissed that "inducement test" as "unquestionably overbroad" and held that "[t]he proper inquiry calls for an

---

[30] Many federal district and state courts have rejected § 230 preemption defenses advanced by online companies when the claims derive liability from conduct other than publishing. *See, e.g.*, *HomeAway*, 2018 WL 1281772, at *6 (booking unregistered rental units); *Airbnb*, 217 F. Supp. 3d at 1072, 1074 (collecting a fee for booking unregistered units); *Daniel v. Armslist, LLC*, No. 2017AP344, 2018 WL 1889123, at *3 (Wis. Ct. App. Apr. 19, 2018) (designing and operating website to encourage illegal gun sales); *McDonald v. LG Elecs. USA, Inc.*, 219 F. Supp. 3d 533, 538 (D. Md. 2016) (negligence and breach of warranty for distributing defective product); *Nunes v. Twitter, Inc.*, 194 F. Supp. 3d 959, 967-68 (N.D. Cal. 2016) (unwanted delivery of third-party tweets in violation of Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227); *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257, 1263 (N.D. Cal. 2006) (misleading dissemination of profiles created by third parties); *see also Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874, 891-92 (N.D. Cal. 2017) (observing that CDA may not bar claims against Twitter for sharing advertising revenue with Hamas where those payments could give rise to liability, but declining to reach the issue because the claim failed on its facts), *appeal pending*, No. 17-17536 (9th Cir. filed Dec. 26, 2017).

examination of the elements" of the claim to determine whether they "require[ ]" that manufacturers label their products in a particular way. *Id.* at 445. Similarly, under § 230, the fact that subjecting an online company to liability might induce it to engage in activity that can be characterized as publishing (such as by removing or editing content to avoid future liability) does not suffice for preemption.

### B. Aimco's Claims Do Not Derive Liability From Publishing

**1.** Aimco's claims fall outside § 230's limited scope because they do not derive liability from publishing user content. The conduct at issue is akin to a real estate brokerage that displays in its windows the listings of properties available for short-term rentals. If the real estate agent helps a tenant breach a lease by brokering an unauthorized short-term rental, the agent would be subject to liability for its actions without regard to the window displays. Indeed, courts have upheld claims similar to Aimco's, as elaborated below. The district court erred in treating § 230 as conferring immunity simply because the unlawful activity was conducted over the Internet. An online company's conduct does not "magically become lawful" merely because it operates a website. *Roommates*, 521 F.3d at 1164.

***Tortious Interference with Contract.*** Aimco's claim for tortious interference with contract seeks to hold Airbnb liable for conduct "that facilitated the breach of Plaintiffs' lease agreements." ER 243 (Compl. ¶ 85). The elements of such a claim are: "(1) [the existence of ] a valid contract between [the] plaintiff

33

and a third party; (2) [the] defendant's knowledge of th[e] contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

Here, liability derives from Airbnb's "intentional acts" to "facilitate[] the breach of" Aimco's leases, including the brokerage services described above, after being informed that Aimco's leases prohibit short-term rentals. ER 226-228, 232-237, 239-240, 243 (Compl. ¶¶ 12-20, 37-56, 64, 66, 85); *see supra* pp. 9-17. Thus, the "legally significant event[s]," *Barnes*, 570 F.3d at 1107, are Airbnb's performance of brokerage services that induce tenants to breach their leases. Those activities are not "publishing" — they are not "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.* at 1102. Moreover, courts have recognized that real estate brokers and other non-publishing companies can be held liable under analogous theories.[31] Because

---

[31] *See Blizzard Entm't Inc. v. Ceiling Fan Software LLC*, 28 F. Supp. 3d 1006, 1016 (C.D. Cal. 2013) (seller of software that helps video game players cheat interfered with license agreement between game manufacturer and game players, prohibiting the use of such software); *Madison Third Bldg. Cos. v. Berkey*, 30 A.D.3d 1146, 1146 (N.Y. App. Div. 1st Dep't 2006) (property owner stated interference claim against brokers for negotiating new lease that enabled tenant to breach existing lease); *Shamblin v. Berge*, 166 Cal. App. 3d 118, 122-24 (1985)

the conduct on which the claim is based is not "identical to publishing," *Barnes*,
570 F.3d at 1107, § 230 does not preempt the claim.

*Interference with Prospective Economic Advantage.* The elements of this
claim are that the defendant knew about, and committed wrongful "intentional
acts" designed to disrupt, an economic relationship between the plaintiff and a
third party and that harmed the plaintiff. *See Korea Supply Co. v. Lockheed Martin
Corp.*, 29 Cal. 4th 1134, 1153 (2003). The intentional acts here are Airbnb's
performance of brokerage services, including "renting apartments" and "processing
financial transactions to facilitate the unauthorized short-term rentals," ER 246
(Compl. ¶ 108), which are wrongful because, among other things, they violate local
zoning laws, *see supra*, p. 21 & n.25. Those acts are not "publishing," and they are
akin to acts for which non-publishing, brick-and-mortar businesses have been held
liable.[32]

*Trespass and Aiding and Abetting Trespass.* A trespass claim alleges an
intentional, reckless, or negligent entry onto the property of another without the
owner's permission, causing harm for which the plaintiff's conduct was a

---

(affirming verdict of interference against real estate agents that caused would-be
buyers to breach purchase contract).

[32] *See Abraham v. Pac. Union Real Estate Grp., Ltd.*, No. A098900, 2004
WL 1047392, at *9-10 (Cal. Ct. App. May 6, 2004) (reversing summary judgment
because of fact issues as to whether real estate broker interfered with lease by
helping force a tenant out of a rent-controlled unit).

substantial factor. *See Ralphs Grocery Co. v. United Food & Commercial Workers Union Local 8*, 113 Cal. Rptr. 3d 88, 93 (Ct. App. 2010), *reversed on other grounds by* 55 Cal. 4th 1083 (2012). One who causes another to make such an entry may be liable for trespass. *See Martin Marietta Corp. v. Ins. Co. of N. Am.*, 40 Cal. App. 4th 1113, 1132 (1995). Aiding and abetting trespass occurs when the defendant knows about and "substantially assist[s]" the trespass. *Upasani v. State Farm Gen. Ins. Co.*, 227 Cal. App. 4th 509, 519 (2014).

Aimco's claims for trespass and aiding and abetting trespass "do[ ] not seek to hold [Airbnb] liable as a publisher or speaker of third-party content, but rather as" a person who causes or substantially assists in unauthorized and harmful entry by Airbnb customers. *Barnes*, 570 F.3d at 1107; *see* ER 248 (Compl. ¶¶ 120-122, 127-128). Courts have recognized trespass claims based on comparable theories against brick-and-mortar businesses.[33]

### *Unfair Competition Under California Business & Professions Code § 17200 et seq.* California's Unfair Competition Law, Cal. Bus. & Prof. Code

---

[33] *See Aberdeen Apartments v. Cary Campbell Realty All., Inc.*, 820 N.E.2d 158, 170 (Ind. Ct. App. 2005) (reversing denial of landlord's motion to enjoin, under trespass theory, real estate company from sending unauthorized individuals into landlord's property to distribute advertisements for new homes); *see also Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events LP*, No. CV 08-0856 DSF (RCx), 2009 WL 10671400, at *5-6 (C.D. Cal. Aug. 12, 2009) (selling non-transferrable tickets).

§ 17200 *et seq.* ("UCL"), is a "sweeping" statute, *Kwikset Corp. v. Superior Court of Orange Cty.*, 51 Cal. 4th 310, 320 (2011), that prohibits "any unlawful, unfair or fraudulent business act or practice," Cal. Bus. & Prof. Code § 17200. Violations of other laws are actionable under the "unlawful" prong of the UCL. *See Blizzard*, 28 F. Supp. 3d at 1017 (tortious interference actionable under UCL). Airbnb's conduct in brokering unauthorized rentals violates the UCL by, among other things, "allowing" and "enabling" unauthorized short-term rentals, causing trespass, and violating local zoning laws. ER 232, 243-244 (Compl. ¶¶ 35, 90). As with the interference and trespass claims, liability derives from Airbnb's brokering activities, not the publication of third-party content. Section 230 therefore does not preempt the claim.

*Unjust Enrichment.* To prevail on a claim that Airbnb was unjustly enriched, Aimco must show the "receipt of a benefit and [the] unjust retention of the benefit at the expense of another." *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000); *see also Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Aimco alleges that Airbnb has received and unjustly retained benefits from "facilitating and brokering" rentals at Aimco's properties over Aimco's repeated objections. ER 246 (Compl. ¶ 103). Because liability derives from brokering, not publication, the claim is not preempted by § 230.

*Private Nuisance.* A nuisance claim requires "some sort of conduct . . . that unreasonably interferes with another's use and enjoyment of his property." *Lussier v. San Lorenzo Valley Water Dist.*, 206 Cal. App. 3d 92, 102 (1988). Because the conduct that Aimco alleges created such an interference is Airbnb's brokering activities, not publishing, ER 249 (Compl. ¶ 131), this claim, too, is not preempted by § 230.

In sum, an "examination of the elements" of Aimco's claims, *Bates*, 544 U.S. at 445, demonstrates that none of the claims is preempted because none of "the dut[ies] that [Aimco] alleges [Airbnb] violated derives from [Airbnb's] status or conduct as a 'publisher or speaker'" of user content, *Barnes*, 570 F.3d at 1102.

**2.** Two additional considerations reinforce the conclusion that § 230 does not preempt Aimco's claims. *First*, as in *Internet Brands*, "[t]he core policy of section 230(c)(1) supports" rejecting Airbnb's preemption defense. 824 F.3d at 851. Section 230 was enacted in "reaction to *Stratton Oakmont*" and was intended to enable websites "to act as a 'Good Samaritan' to self-regulate offensive third party content without fear of liability." *Id.* at 852. Congress did not intend to "give online businesses an unfair advantage over their real-world counterparts," *Roommates*, 521 F.3d at 1164 n.15, by exempting them from generally applicable laws and regulations (including not only tort law but also zoning regulations and licensing requirements for real estate brokers) governing their non-publishing

38

conduct.  *Cf. Bond v. United States*, 134 S. Ct. 2077, 2089 (2014) (clear statement required to interpret statute to override "areas of traditional state responsibility," including "land . . . use").[34]  Nor does § 230's "narrow language," *Internet Brands*, 824 F.3d at 853, reflect any intent to radically disrupt property rights by shielding Airbnb from liability for brokering rentals that trespass on private property and disturb other residents' quiet and safe enjoyment of their apartments.  Because Aimco's claims are based on Airbnb's non-publishing brokerage services, and not Airbnb's "efforts, or lack thereof, to edit, monitor, or remove user generated content," rejecting Airbnb's preemption defense "would not discourage the core policy of section 230(c), 'Good Samaritan' filtering of third party content." *Internet Brands*, 824 F.3d at 852.

The *Internet Brands* Court also rejected the policy argument that preemption was necessary to avoid a "chilling effect upon Internet free speech."  *Id.*  It acknowledged that "imposing any tort liability on Internet Brands for its role as an interactive computer service could be said to have a 'chilling effect' on the internet, if only because such liability would make operating an internet business marginally more expensive."  *Id.*  "But," the Court concluded, "such a broad policy

---

[34] *See also* Br. of *Amici Curiae* Internet, Business, & Local Government Law Professors in Supp. of Def.-Appellee & Affirmance of District Court at 7-9, *HomeAway Appeal*, No. 18-55367 (9th Cir. filed May 23, 2018), ECF No. 41.

argument does not persuade us" because it is contrary to *Barnes*' holding that "the CDA does not declare 'a general immunity from liability deriving from third-party content.'" *Id.* (quoting *Barnes*, 570 F.3d at 1100). The same analysis applies here.

*Second*, the fact that Aimco would not have a claim for defamation on the facts alleged in the complaint bolsters the conclusion that § 230 does not apply. In *Barnes*, this Court looked to the "reach" of defamation to "confirm[]" that the negligent-undertaking claim was preempted. 570 F.3d at 1103. Defamation requires "a false and defamatory statement concerning another," Restatement (Second) of Torts § 558 (1977), and a "communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him," *id.* § 559. Here, Aimco does not allege that any of the user-provided content in the listings displayed on Airbnb's website is defamatory. To be sure, "the tort of defamation is not the only form of liability for publishers to which subsection (c)(1) applies." *Barnes*, 570 F.3d at 1103. But the absence of a defamation claim "under our facts . . . strongly confirms [the] view" that § 230 does not preempt this lawsuit. *Id.*

### C. The District Court Committed Legal Errors In Dismissing Aimco's Complaint

The district court committed three legal errors in dismissing Aimco's claims based on Airbnb's non-publishing conduct. *First*, in concluding that Aimco's

40

complaint "takes issue" with user-provided content, the district court mischaracterized the operative complaint and ignored this Court's standard for § 230 preemption in *Barnes* and *Internet Brands*. *Second*, the district court erroneously relied on a superseded complaint in reaching its incorrect conclusion that Aimco's complaint "takes issue" with third-party content. *Third*, the district court relied on off-point, primarily out-of-circuit cases while rejecting directly analogous, persuasive authority that correctly applied this Court's precedents.

### 1. The district court's reasoning contravenes this Court's standard for § 230 preemption

The district court recognized that Aimco's complaint sought to hold Airbnb liable for services including "contracting with Aimco's tenants" and "processing payments for rentals of Aimco-owned apartments." ER 9 (Order); *see supra* pp. 9-17 (describing Airbnb's non-publishing conduct). It nevertheless concluded that Aimco "takes issue" with Airbnb listings and that § 230 therefore bars its claims. ER 11 (Order). In reaching that conclusion, the court not only badly mischaracterized the complaint's allegations but also disregarded the standard for § 230 preemption under this Court's cases. The plaintiff in *Barnes* took issue with Yahoo's failure to remove the malicious profile that harmed her, but that was not a sufficient basis to conclude that § 230 preempted the complaint. *See* 570 F.3d at 1107-09. Instead, this Court conducted a claim-by-claim analysis to determine

41

whether the activity from which liability derived under each claim was "identical to publishing." *Id.* at 1107.

Under the district court's approach of determining when a complaint "takes issue" with publication, a defendant cannot be held liable for any activity that has some relationship to the publication of user content. That approach allows § 230 preemption to be based on but-for causation, which this Court rejected in *Internet Brands* as inconsistent with § 230's "narrow language and its purpose." 824 F.3d at 853. A defendant that operates a website will nearly always be able to point to some connection to the display of user content in an attempt to claim § 230's protection. But, although "Congress could have written the statute more broadly" to cover all claims against website operators, "it did not." *Id.*; *see also Barnes*, 570 F.3d at 1100 (§ 230 does not provide "general immunity"); *City of Chicago*, 624 F.3d at 366 (same). Thus, even if Airbnb's displaying of listings on its website "could be described as *a* 'but-for' cause of [Aimco's] injuries," that is not enough for preemption under § 230. *Internet Brands*, 824 F.3d at 853 (emphasis added).

## 2. The district court erroneously relied on a superseded complaint

The district court also erred in basing its ruling on the observation that Aimco's superseded original complaint included "listing apartments" among Airbnb's "wrongful act[s]." ER 11 & n.8 (Order). It is "well-established" in this circuit that an amended complaint supersedes the original, the latter of which then

"cease[s] to exist." *Ramirez v. County of San Bernardino*, 806 F.3d 1002, 1008
(9th Cir. 2015). The district court should have looked only to the claims and
theories alleged in Aimco's operative complaint, which the district court
acknowledged were based on Airbnb's brokerage activities including "engaging in
rental transactions," providing "ancillary services" such as tax collection and
insurance, "contracting with Aimco's tenants," and "processing payments for
rentals of Aimco-owned apartments." ER 3, 7-9 (Order). The district court erred
in construing the complaint to allege a theory Aimco expressly disclaimed. *See
Barnes*, 570 F.3d at 1098 & n.1 (in deciding a motion to dismiss, a court construes
allegations in the "light most favorable to the plaintiff"); ER 239 (Compl. ¶¶ 62-
64) (disclaiming liability for "third-party content").

The district court also mistakenly concluded, based on the superseded
complaint, that Aimco was making the same "basic argument" that failed as
"creative pleading" in *Kimzey*. ER 9-11 (Order) (quoting *Kimzey v. Yelp! Inc.*, 836
F.3d 1263, 1266 (9th Cir. 2016)). In *Kimzey*, "[t]here was . . . no question that" the
plaintiff's defamation claims were "premised on Yelp's publication" of a negative
review and one-star rating. 836 F.3d at 1268. The complaint in *Kimzey* did not
allege that the defendant did anything that gave rise to liability other than
"publish[ing] user-generated speech that was harmful to" the defendant. *Id.* at
1266. That is why this Court's opinion addressed only whether the plaintiff had

43

adequately alleged that Yelp was subject to liability as an "information content provider." *See id.* at 1268-70. *Kimzey* provides no support for the district court's conclusion that § 230 preempts Aimco's claims based on Airbnb's non-publishing conduct.

### 3. The district court erroneously relied on off-point, out-of-circuit decisions

Instead of applying this Court's "derives liability" standard to the specific causes of action and facts alleged in Aimco's complaint, the district court looked to out-of-circuit cases that it erroneously perceived to be "analogous." ER 10-11 (Order). The court primarily relied on a state intermediate appellate decision holding that the bare fact of "payment processing" does not make an online business an "information content provider."[35] That decision does not support the district court's conclusion because, as this Court recognized in *Barnes*, the question whether a cause of action "treat[s]" a defendant as a "publisher" under § 230 is distinct from whether that defendant is an "information content provider." 570 F.3d at 1100. In other cases the district court cited, *see* ER 10-11 (Order), the plaintiffs' claims were based on defendants' publishing activities, and additional,

---

[35] ER 9-10 (Order) (discussing *Hill vs. StubHub!*, 727 S.E.2d 550 (N.C. Ct. App. 2012) (StubHub's payment processing services held "irrelevant" to that court's "information content provider" inquiry).

non-publishing conduct was not at issue.[36]  The remaining cases provide no

guidance here because the plaintiffs' allegations regarding "payment processing"

or other non-publishing conduct were conclusory or otherwise entirely unlike

Aimco's allegations regarding Airbnb's extensive brokerage services.[37]

The district court also erred in relying on *Donaher, III v. Vannini*, No. CV-

16-0213, 2017 WL 4518378 (Me. Super. Ct. Aug. 18, 2017), which involved

---

[36] *See Doe v. MySpace, Inc.*, 528 F.3d 413, 415-18 (5th Cir. 2008) (§ 230 bars claim based on social media website's publication of an underage user's profile that led to her meeting and being sexually assaulted by another user); *Green v. Am. Online (AOL)*, 318 F.3d 465, 470-71 (3d Cir. 2003) (§ 230 bars claim against AOL for "negligent failure to properly police its network for content transmitted by its users"); *Gibson v. Craigslist, Inc.*, No. 08 Civ. 7735(RMB), 2009 WL 1704355, at *4 (S.D.N.Y. June 15, 2009) (§ 230 bars complaint that would hold Craigslist liable for negligent failure to screen "the dissemination of a third party's content").

[37] *See Inman v. Technicolor USA, Inc.*, Civ. A. No. 11-666, 2011 WL 5829024, at *1, *6 (W.D. Pa. Nov. 18, 2011) (although plaintiff referred to "business transactions and the shipping and packaging of goods," the complaint did "not set forth any facts" regarding eBay's activities); *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 834-36 (2002) (only relevant non-publishing conduct alleged was eBay's failure to comply with statute requiring sellers of antiquities to provide a certificate of authenticity for memorabilia); *Stoner v. eBay, Inc.*, No. 305666, 2000 WL 1705637, at *2, *4 (Cal. Super. Ct. Nov. 1, 2000) (concluding that facts alleged did not support plaintiff's claims that eBay was an "active participant" in challenged transactions, but acknowledging that immunity would not apply if website were "actively involved" in illegality).  Moreover, a number of the cases on which the district court relied pre-date and are inconsistent with the reasoning in this Court's decisions in *Barnes* and *Internet Brands*.  *See, e.g.*, *Stoner*, 2000 WL 1705637, at *2 (looking to whether eBay's acts "make eBay the *seller*" rather than the duty from which liability derives) (emphasis added).

45

claims against Airbnb. The court in that case appears to have understood the payment services Airbnb provides as analogous to the payments at issue in *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 20-21 (1st Cir. 2016) ("*Backpage*"). *See Donaher*, 2017 WL 4518378, at *3. The "payment processing" at issue in *Backpage* was the receipt of payment for the publication of third-party advertisements for escort services. *See* 817 F.3d at 20. There was no allegation that Backpage actually *brokers* escort services in the way that Airbnb brokers prohibited rentals (such as by scheduling the services escorts provide to their clients, receiving clients' money to pay escorts upon services being rendered, or resolving disputes between escorts and their clients); nor is there any indication that the *Donaher* court took note of that distinction.[38]

The district court also erred in failing to follow the holding of a court in the Northern District of California that § 230 does not protect *the exact same* "reservation and/or payment service[s]" at issue in this litigation. *Airbnb*, 217 F.

---

[38] Moreover, the court in *Backpage* embraced a but-for test that is inconsistent with *Internet Brands*. *See Backpage*, 817 F.3d at 19-20 (observing that "there would be no harm to [the plaintiffs] but for the content of the postings"); *see also Airbnb*, 217 F. Supp. 3d at 1073 (declining to rely on *Backpage* because the First Circuit applied a "more expansive" test for § 230 preemption than does this Court).

In addition, although one Illinois court has followed the district court's opinion in this case, that decision is erroneous for the same reasons as the district court's. *See MDA City Apartments, LLC v. Airbnb, Inc.*, No. 17 CH 9980, 2018 WL 910831, at *13-14 (Ill. Cir. Ct. Feb. 14, 2018).

Supp. 3d at 1071; *accord HomeAway*, 2018 WL 1281772, at \*5-6 (denying preliminary injunction challenging city ordinance requiring Airbnb and others to confirm legality of rentals before providing booking services because the ordinance penalizes "facilitating business transactions" that violate the law, not "*publishing* activities"); *HomeAway*, No. 2:16-cv-06641-ODW (AFM), 2018 WL 3013245, at \*1 (C.D. Cal. June 14, 2018) (dismissing challenge to ordinance). The district court's only basis for distinguishing *Airbnb* was its erroneous assertion that, whereas the San Francisco ordinance at issue in that case imposed a fee on Airbnb's "booking services," here, "Airbnb's website features are central to Aimco's claims." ER 12 (Order). As demonstrated, that assertion both mischaracterizes Aimco's complaint and disregards this Court's decisions in *Internet Brands* and *Barnes*.[39]

---

[39] As a makeweight at the end of its opinion, the district court referred to the notion that the CDA was intended to promote "e-commerce." ER 12 (Order) (quoting *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003)). The quoted portion of the *Batzel* opinion referred to congressional findings and policy statements describing the Internet as "'a forum'" for "'political discourse,'" "'cultural development,'" and "'intellectual activity.'" 333 F.3d at 1027 (quoting 47 U.S.C. § 230(a)). *Batzel* also cited statements by members of Congress expressing outrage over pornography and a desire to address the problem without government censorship. *See id.* at 1028 & n.11 (citing 141 Cong. Rec. H8469-72 (Aug. 4, 1995)). Nothing in *Batzel*, or the provisions and legislative history to which it referred, suggests an intent to protect online businesses that provide the same services as brick-and-mortar competitors while claiming special immunity from suit under the CDA. This Court's subsequent en banc decision in *Roommates* confirmed that the CDA "was not meant to create a lawless no-man's-land on the

## II.    SECTION 230 DOES NOT PREEMPT CLAIMS BASED ON AIRBNB'S OWN CONTENT

In addition to its brokerage services and other non-publishing conduct discussed in Part I, Airbnb creates and publishes original content that allows its customers to take advantage of its services — that is, the online tools and information that allow Airbnb's customers to book and pay for rentals anonymously.  ER 227 (Compl. ¶¶ 16-18).  Section 230 does not preempt Aimco's claims premised on content for which Airbnb is an "information content provider" within the meaning of that provision.  47 U.S.C. § 230(c)(1), (f)(3).

### A.    Section 230 Does Not Preempt Aimco's Claims Based On Airbnb's Content

Section 230 does not preempt Aimco's claims based on Airbnb's own content.  By its terms, that provision applies only to claims that treat a website operator as the publisher "of any information provided by *another* information content provider."  47 U.S.C. § 230(c) (emphasis added).  Thus, § 230 "applies only if the interactive computer service provider is not . . . 'responsible, in whole or in part, for the creation or development of' the offending content."  *Roommates*, 521 F.3d at 1162 (quoting 47 U.S.C. § 230(f)(3)).  The CDA "does not immunize

---

Internet."  521 F.3d at 1164; *see id.* at 1169 n.24 ("Compliance with laws of general applicability seems like an entirely justified burden for all businesses, whether they operate online or through quaint brick-and-mortar facilities.").

[a website operator] for the content it creates and posts." *Xcentric Ventures, LLC v. Borodkin*, 798 F.3d 1201, 1203 (9th Cir. 2015) (per curiam).[40]

"[C]reation" and "development" — the operative terms in § 230's definition of "information content provider," 47 U.S.C. § 230(f)(3) — are broad. *See In re Amex-Protein Dev. Corp.*, 504 F.2d 1056, 1058 (9th Cir. 1974) (per curiam) ("creat[ion]" means "to bring into existence," "to cause to be or to produce," "to cause or occasion"); *Roommates*, 521 F.3d at 1167-68 (in the context of the Internet, "development" can mean "'the process of researching, writing, gathering, organizing and editing information for publication on web sites'"). Section 230(f)(3) further expands the reach of those broad terms, by providing that a platform may be held liable for content it creates or develops only "in part." 47 U.S.C. § 230(f)(3).

---

[40] Many other courts have reached the same conclusion. *See, e.g.*, *Hiam v. HomeAway.com, Inc.*, 267 F. Supp. 3d 338, 348 (D. Mass. 2017) (§ 230 does not preempt claims based on "HomeAway's own content" and related actions), *aff'd on other grounds*, 887 F.3d 542 (1st Cir. 2018); *NPS LLC v. StubHub, Inc.*, Civ.A. No. 06-4874-BLS1, 2009 WL 995483, at *11, *13 (Mass. Super. Ct. Jan. 26, 2009) (§ 230 does not preempt claim against website that "help[]ed to develop unlawful content" that contributed to illegal ticket scalping, such as through not requiring ticket sellers to show the face value of the ticket); *Mazur v. eBay Inc.*, No. C 07-03967 MHP, 2008 WL 618988, at *14 (N.D. Cal. Mar. 4, 2008) (where eBay's own content affirmatively promised auctions were safe, § 230 did not bar claims premised on its failure to ensure third-party auctions were safe).

In *Roommates*, this Court held that § 230 did not preempt antidiscrimination claims against the operator of "a website designed to match people renting out spare rooms with people looking for a place to live," because the operator provided functionalities that contributed to the illegality of user listings. 521 F.3d at 1161. Among other content, the plaintiffs sought to hold Roommates liable for the "development and display of subscribers' discriminatory preferences." *Id.* at 1165. The Court held that Roommates helped "develop" the user-created listings through its functional content, including drop-down menus that required users to give their preferences based on categories such as race, as well as search and email notification functions that filtered results based on a user's preferences. *See id.* at 1165-67. Not every user's preferences were necessarily discriminatory — for example, a user could click a box indicating a willingness to live with roommates without regard to their sexual orientation. *See id.* at 1165.

Even though users provided the substantive content for each listing, and therefore controlled whether any particular listing was, in fact, discriminatory, the Court held that Roommates was an "information content provider" because, "[b]y any reasonable use of the English language, Roommate[s] is 'responsible' at least 'in part' for each subscriber's profile page, because every such page is a collaborative effort between Roommate[s] and the subscriber." *Id.* at 1165-67. This Court distinguished Roommates from a site, such as an "ordinary search

engine," *id.* at 1167, that provides "*neutral* tools to carry out what may be unlawful or illicit searches," *id.* at 1169, because Roommates "materially contribut[ed]" to the "alleged unlawfulness" of discriminatory housing ads, *id.* at 1168.

### B.     Airbnb's Content Enables Unauthorized Rentals

Airbnb is an information content provider of online content that harms Aimco because it creates and develops content designed to enable Aimco's tenants to rent apartments illegally to strangers. *See* 521 F.3d at 1172; ER 243 (Compl. ¶ 86).

*First*, Airbnb creates and publishes listings for unauthorized rentals through a "collaborative effort" with tenants. *Roommates*, 521 F.3d at 1167. Airbnb solicits information from tenants and combines that information with Airbnb-created content to create a listing in a standardized format developed by Airbnb and governed by Airbnb's Content Policy. ER 226-227 (Compl. ¶ 12); *see supra* pp. 10-13, 16. Each Airbnb listing presents the tenant's first name and photo in a standardized format and location, and additional contact information is prohibited. *See supra* pp. 13, 16. Airbnb also offers and pays for professional photography, and displays such photos as "verif[ied]" by Airbnb. ER 227 (Compl. ¶¶ 16-17); *supra* p. 11. Hosts that use Airbnb's "'Smart Pricing' tool" authorize Airbnb to set the price for a rental. ER 227 (Compl. ¶ 18); *supra* p. 14. Airbnb displays "Highlights," such as whether a tenant is an Airbnb-designated "superhost" or

whether a rental is a "rare find." *Supra* p. 13 (screenshot). All told, the description of the property supplied by the tenant is a relatively small portion of the listing. *Id.*

*Second*, Airbnb creates and displays content that enables tenants to use Airbnb's brokerage services. For example, to book a rental, a traveler must enter desired dates and the number of guests into a "booking box" that Airbnb publishes as a part of each listing. *See supra* pp. 12-14. The publication of that Airbnb-created content — the booking box that appears on a computer screen — is a distinct act from effectuating the booking when a traveler clicks the "book" button.

*Third*, Airbnb's content "materially contribut[es]," *Roommates*, 521 F.3d at 1168, to unauthorized rentals because it allows properties to be advertised, booked, and paid for anonymously, which helps them avoid detection. ER 233-234 (Compl. ¶¶ 44-45) ("Airbnb operates through [the] anonymity of its hosts."). For example, Airbnb's booking box is what allows its customers to book rentals without publishing their contact information or property location. If Airbnb did no more than display advertisements for third-party listings like a newspaper does, Aimco could readily identify lease violators through the advertisement itself. Instead, Aimco cannot identify lease-violating tenants through Airbnb's listings without agreeing to Airbnb's terms of service and using Airbnb's website to book and pay for a stay in its own property. *See supra* pp. 16-17 (Airbnb does not

provide property location until a tourist completes a booking by paying Airbnb); ER 233-234, 243 (Compl. ¶¶ 44-45, 86).

### C. The District Court Erred In Holding That § 230 Preempts Claims Based On Content Airbnb Creates

**1.** The district court erred in holding that Airbnb is not an information content provider because "Airbnb hosts . . . are responsible for providing the actual listing information" and "no [listing] has any content until a user actively creates it." ER 8 (Order) (alteration in original) (quoting *Carafano*, 339 F.3d at 1124). That analysis relies on the "unduly broad" language from *Carafano* that this Court, sitting en banc, clarified in *Roommates*. As the Court explained, "[p]roviding immunity every time a website uses data initially obtained from third parties would eviscerate" Congress's exclusion for providers who develop content "'in part.'" 521 F.3d at 1171 (quoting 47 U.S.C. § 230(f)(3)).

In *Roommates,* it was also the case that no listing would have content until a user created it, but that did "not preclude Roommate[s] from *also* being an information content provider by helping 'develop' at least 'in part' the information in the profiles." *Id.* at 1165. Likewise, Airbnb cannot escape liability for its own

booking-related content merely because it presents that content "intertwined," MTD at 20, 24, with information provided by Aimco's tenants.[41]

**2.**     Holding Airbnb liable as an information content provider is consistent with this Court's decision in *Kimzey* (on which the district court relied, ER 6-8 (Order)) because Airbnb's original content is not "simply a representation" of user-created information.  836 F.3d at 1270.  The Court in *Kimzey* rejected the plaintiff's "convoluted[] theory" under which Yelp became the author of a negative review for purposes of a defamation claim because its website aggregated user-created data to create a "one-star rating" that appeared alongside the allegedly defamatory review.  *Id.* at 1269.  Here, the content that allows Airbnb's customers to book rentals, communicate, and pay each other anonymously is Airbnb's own creation, and it does not "'represent[]'" or "aggregate" user-created data.  *Id.* at 1270.  Nor does Airbnb simply set broad editorial parameters for content appearing on its site.  *Cf. Evans v. Hewlett-Packard Co.*, No. C 13-02477 WHA, 2013 WL 5594717, at *4 (N.D. Cal. Oct. 10, 2013).

---

[41] The district court also mischaracterized Aimco's complaint as alleging that the "listings" are "'offending'" because "they advertise rentals that violate Aimco's lease agreements."  ER 8 (Order).  Airbnb's content is "unlawful" because it effectuates or otherwise contributes to unauthorized rentals, *see supra* Part II.B, not because it "advertises" them.

**3.**     Airbnb's content "materially contributes" to the illegality alleged in Aimco's complaint even though its services can be used by parties offering authorized and unauthorized listings alike.  The district court erroneously reached the opposite conclusion by analogizing Airbnb's platform to the dating website in *Carafano* that "merely provide[d] a framework that could be utilized for proper or improper purposes."  ER 8 (Order) (quoting *Roommates*, 521 F.3d at 1172).  Critically, the dating website "did absolutely nothing to enhance" the defamation, "to encourage defamation[,] or to make defamation easier."  *Roommates*, 521 F.3d at 1172.

Airbnb's content is everything that the dating website's was not.  Airbnb encourages and enhances unauthorized rentals and makes them *significantly* easier to effectuate.  Most notably, it requires customers to conceal their locations and contact information, refusing to disclose this information until a booking is paid for, and removing content that violates that policy.  *See supra* pp. 16-17.  Airbnb is therefore akin to the website in *Roommates*, which materially contributed to illegal listings not because it required its users to discriminate (it did not, *see id.* at 1165), but because it designed its site to allow users to discriminate.  *See id.* at 1167

55

(Roommates was "designed to achieve illegal ends" by making it "more difficult or impossible for individuals with certain protected characteristics to find housing").[42]

In short, because Airbnb "is directly involved with developing and enforcing a system" that enables tenants to breach Aimco's leases, § 230 does not apply. *Roommates*, 521 F.3d at 1172; *see also Daniel*, 2018 WL 1889123, at *8 (§ 230 does not bar claims against gun-sale website based on "content it creates" to encourage illegal gun sales, including through anonymizing "unregistered" posts); *J.S., S.L. v. Vill. Voice Media Holdings, L.L.C.*, 359 P.3d 714, 717-18 (Wash. 2015) (en banc) (holding that classified advertising website Backpage is an "information content provider" because it was allegedly designed to allow sex traffickers "to evade law enforcement").

---

[42] The district court erroneously relied on *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 986 (N.D. Cal. 2015), for the premise that the "materially contribute[s]" test is satisfied only if a provider "require[s]" a user to create illegal content. ER 10 (Order). That approach finds no support in the statutory language (which refers to creating or developing content "in part," 47 U.S.C. § 230(f)(3)) and misreads *Roommates*. The *Roommates* Court explained that § 230 does not apply if a website "encourage[s] illegal content, *or* design[s] [the] website to require users to input illegal content." 521 F.3d at 1175 (emphasis added); *see also FTC v. Accusearch Inc.*, 570 F.3d 1187, 1200 (10th Cir. 2009) (describing Roommates as "encourag[ing]" discriminatory content). Indeed, the portion of *Opperman* on which the district court relied was denying reconsideration of its prior conclusion that Apple was an information content provider because it "encourage[d] data theft" by third parties. *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1032 (N.D. Cal. 2014). In any case, Airbnb does require its customers to conceal their locations. *See supra*, pp. 16-17.

### III. THE DISTRICT COURT ABUSED ITS DISCRETION IN DISMISSING AIMCO'S COMPLAINT WITH PREJUDICE

In the alternative, the district court abused its discretion in dismissing the complaint with prejudice and failing to permit leave to amend. Rule 15 provides that leave to amend should be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), and this Court has applied that "policy" with "extreme liberality," *Eminence Capital*, 316 F.3d at 1051 (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001)). Leave to amend should be denied only when there is a good reason, such as "bad faith" or "futility." *Id.* at 1052; *see also Barahona v. Union Pac. R.R. Co.*, 881 F.3d 1122, 1134 (9th Cir. 2018) (finding "leave to amend should be denied as futile 'only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense'"). Although dismissal with prejudice under § 230 may be appropriate if "[t]he basis" of a claim is the defendant's "role as a publisher of third-party information," *Beckman*, 668 F. App'x at 759, Aimco's claims are not based on Airbnb's publication of user information. Moreover, Aimco's complaint could be amended to add significant new allegations regarding Airbnb's extensive

activities to broker unauthorized rentals and to create content to enable those rentals.[43]

Here, although Aimco requested leave to amend, *see* Pls. Opp'n at 25, the district court dismissed the complaint with prejudice and without addressing Aimco's request. The court did not find that any amendment would be futile or was sought in bad faith. By failing to "consider the relevant factors and articulate why dismissal should be with prejudice," the district court abused its discretion. *Eminence Capital*, 316 F.3d at 1052; *see also Beckett v. Mellon Inv'r Servs. LLC*, 329 F. App'x 721, 723 (9th Cir. 2009) (holding that district court abused its discretion in denying leave to amend to allege non-preempted claims).

## CONCLUSION

The district court's judgment dismissing the complaint should be reversed and the case remanded for further proceedings.

---

[43] In addition to facts contained in Aimco's preliminary injunction briefing, Aimco has learned additional facts regarding Airbnb's practices to encourage, facilitate, and broker unauthorized rentals through litigation involving other Aimco properties. *See* Pls.' Mot. for Leave to File Fourth Am. Compl., *Bay Parc Plaza Apartments, L.P. v. Airbnb, Inc.*, No. 2017-003624-CA-1 (Fla. 11th Cir. Ct. June 15, 2018), Dkt. 217.

Respectfully submitted,

/s/ *David C. Frederick*

MICHAEL T. WILLIAMS
ALLISON R. MCLAUGHLIN
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-5647
(303) 244-1800

JEREMY B. ROSEN
ERIC S. BOORSTIN
RYAN C. CHAPMAN
HORVITZ & LEVY LLP
3601 West Olive Avenue, 8th Floor
Burbank, California 91505-4681
(818) 995-0800

DAVID C. FREDERICK
BRENDAN J. CRIMMINS
RACHEL PROCTOR MAY
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Plaintiffs-Appellants*

June 22, 2018

59

## STATEMENT OF RELATED CASES

In accordance with Ninth Circuit Local Rule 28-2.6, Aimco states that there is currently a related case pending in this Court, *HomeAway.com, Inc. v. City of Santa Monica*, No. 18-55367 (9th Cir. filed Mar. 21, 2018).  The issue before the Court in *HomeAway* is whether the district court in that case correctly held that, because booking services are not publishing, § 230 does not preempt a local law requiring short-term rental companies, including Airbnb, to confirm that units can be legally rented before booking a transaction.  *HomeAway* thus presents the question whether § 230 preempts an ordinance regulating the same brokerage activities as are at issue here.  The appellants in *HomeAway* submitted their reply brief on June 6, 2018.

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## NINTH CIRCUIT RULE 32-1 FOR CASE NO. 18-55113

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned certifies that this brief complies with the applicable type-volume limitation permitted by Ninth Circuit Rule 32-1. This brief was prepared in Times New Roman 14-font and complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), as well as the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 13,504 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Office Word 2007) used to prepare this brief.

/s/ David C. Frederick
*Counsel for Plaintiffs-Appellants*

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28.1-1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 18-55113

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1.
The brief is [       ] words or [       ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is [13504] words or [       ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is [       ] words or [       ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated [       ]
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is [       ] words or [       ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is [       ] words or [       ] pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is [       ] words or [       ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is [       ] words or [       ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant | /s/ David C. Frederick | Date | Jun 22, 2018

("s/" plus typed name is acceptable for electronically-filed documents)

# ADDENDUM

## TABLE OF CONTENTS

47 U.S.C. § 230 ................................................................................. Add-1

## 47 U.S.C. § 230
## § 230. Protection for private blocking and screening of offensive material

### (a) Findings

The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

### (b) Policy

It is the policy of the United States—

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) Civil liability**

No provider or user of an interactive computer service shall be held liable on account of**--**

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

Add-2

**(d) Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

**(1) No effect on criminal law**

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

**(2) No effect on intellectual property law**

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) State law**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) No effect on communications privacy law**

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5) No effect on sex trafficking law**

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit**--**

   **(A)** any claim in a civil action brought under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

   **(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of Title 18; or

   **(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of Title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

**(f) Definitions**

As used in this section:

   **(1) Internet**

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

   **(2) Interactive computer service**

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

**(3) Information content provider**

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4) Access software provider**

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

> **(A)** filter, screen, allow, or disallow content;
>
> **(B)** pick, choose, analyze, or digest content; or
>
> **(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be filed electronically the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 22, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ David C. Frederick
*Counsel for Plaintiffs-Appellants*